In re Theresa JOHNSON, Debtor.

Theresa JOHNSON, Plaintiff,

v.

ALLSTATE INSURANCE COMPANY, Defendant.

Bankruptcy No. 89–00908(RG).
Adv. No. 89–0461.

United States Bankruptcy Court,
D. New Jersey.

April 24, 1992.

David Paul Daniels, Camden, N.J., for debtor.

White and Williams by Christopher P. Leise, Westmont, N.J., for Allstate Ins. Co.

## OPINION

ROSEMARY GAMBARDELLA, Bankruptcy Judge.

This matter comes before the Court by way of an adversary complaint filed by the debtor, Theresa Johnson, against Allstate Insurance Company. This case involves an insurance claim on property damaged by fire on November 24, 1988. The insured, Theresa Johnson ("Ms. Johnson" or "debtor") is the owner of the home located at 109 Brookfield Avenue, Wenonah, New Jersey, where the fire occurred. After reviewing the record, the arguments of counsel, and the pertinent authorities, the Court makes the following findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## FACTS

Ms. Johnson testified that she purchased the home in Wenonah, about seven years before the fire, approximately in 1980 or 1981. (Transcript dated July 18, 1991 at pages 23 and 29) (hereinafter "T1 at ___"). At that time, she also purchased Allstate deluxe homeowners insurance policy AU9601 (hereinafter "the policy" or "Allstate Policy"), which included losses from fire in its coverage. (T1 at 5) (policy # 009989596). Ms. Johnson paid her mortgage to New York Guardian Mortgage Corporation of Hempstead, New York and they in turn, made the payment for the insurance policy. (T1 at 71). Although Ms. Johnson had fallen behind in her mortgage payments, the policy did renew on July 8, 1988, with the policy term of one year. (T1 at 5). Thus, the policy remained in effect at the time of the fire on November 24, 1988.

On July 7, 1987, New York Guardian Mortgage filed a foreclosure action against Theresa Johnson in Gloucester County, New Jersey. (T1 at 5). A foreclosure judgment was entered against Ms. Johnson on February 29, 1988 and the mortgage company scheduled a sheriff sale for June 24, 1988. (T1 at 6). On June 17, 1988, however, Ms. Johnson filed a petition under Chapter 13 of the Bankruptcy Reform Act of 1978 as amended by the Bankruptcy Act Amendments of 1982, the Bankruptcy Amendments and Federal Judgeship Act of 1984, and the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986 (hereinafter, "Bankruptcy Code"), in the Bankruptcy Court for the District of New Jersey. (T1 at 6). This Court dismissed that bankruptcy matter on October 8, 1988. (T1 at 6).

About two weeks before the fire, in early November, 1988, Ms. Johnson's electricity was shut off and she and her three children went to stay with a girlfriend, Elaine Bundy. (T1 at 16). Ms. Johnson remained living with Ms. Bundy after the fire on November 24, 1988 until September of 1989. (T1 at 43, 48, 128). She then moved to 163 Carver Drive, Wenonah, New Jersey, where she presently lives and rents

her father's home. (T1 at 47, 51). Ms. Johnson contacted Allstate Insurance Company (hereinafter "Allstate") after the fire. (T1 at 45). On January 23, 1989, she submitted a proof of loss, represented by a public insurance adjuster, Guardian Adjustment Service, for $68,721.48 for real property loss and damage and a second proof of loss on February 7, 1989 for $31,219.95 for personal property loss. (*See* Proofs of Loss dated January 23, 1989 and February 7, 1989). Allstate conducted an investigation of the fire that included a deposition of Ms. Johnson taken on February 9, 1989. (*See* T1 at 46 and Examination Under Oath of Theresa Johnson dated February 9, 1989 entered as Exhibit D–1). Two weeks after the fire, Ms. Johnson testified that she received $2,000.00 from Allstate, which funds she testified were used to purchase clothing for herself and her children. (T1 at 44–45, 78). Allstate denied the plaintiff's claim on June 13, 1989. (*See* Letter dated June 3, 1989 attached as Exhibit "E" to unsigned copy of Certification of Paul Batteux, dated September 11, 1989).

On February 8, 1989, Theresa Johnson filed the present petition under Chapter 13 of the Bankruptcy Code in this Court. She is currently making payments under a Chapter 13 plan. (T1 at 56). On May 10, 1989, Ms. Johnson filed a complaint against Allstate. (Adversary No. 89–0461). In the complaint, Ms. Johnson alleged that the insurance policy was adequate to cover the claims, that Allstate had not made any payments on these claims and therefore, requested that Allstate be required to pay the claims of $68,721.48 and $31,219.95, plus interest and attorney's fees and costs of the suit. (Complaint dated May 9, 1989).

On June 19, 1989, Allstate filed an answer to the plaintiff's complaint and raised several affirmative defenses. Allstate demanded a dismissal of the plaintiff's complaint together with the judgment that the policy was void and Allstate was not obligated to pay. (Answer, Affirmative Defenses and Jury Demand of Allstate Insur-

ance Company dated June 15, 1989) (hereinafter "Answer, dated June 15, 1989").

On April 12, 1990, the debtor filed a first amended complaint, which included a request for out of pocket living expenses in the sum of $875.00 per month since November 24, 1988. (Plaintiff's First Amended Complaint dated April 11, 1990).[1] Allstate answered the amended complaint with a request that this Court enter a judgment that Allstate is not obligated to make any payment whatsoever to the debtor resulting from the fire of November 24, 1988. (Answer, Affirmative Defenses And Jury Demand Of Allstate To First Amended Complaint, dated May 16, 1990).

This Court heard testimony on July 18, and October 21, 1991. At trial, the parties put on record a number of stipulations, which include the following: the fire occurred on November 24, 1988 and it originated inside the garage area of the house (T1 at 6); the fire was incendiary (T1 at 6); the Township of Deptford received the first report of the fire at 7:13 p.m. on November 24, 1988 (T1 at 5); there was in existence on November 24, 1988, a policy of insurance issued by Allstate Insurance Company to Theresa Johnson and her husband Michael Johnson (T1 at 5); the policy was an Allstate deluxe homeowner's policy form AU9601 (T1 at 5); named on the declaration sheet of the policy as first mortgagee is New York Guardian Mortgage Corporation (T1 at 5); the policy did renew on July 8, 1988, with a policy term of one year (T1 at 5); coverage under the policy for the dwelling loss was $89,000 and coverage under the policy for contents damage was $62,300 (T1 at 7–8); the reasonable cost of repairing the damage to the dwelling caused by the fire at or about a reasonable time after the fire was $68,721.48 (T1 at 7). The parties, however, did not agree that this was the proper measure of recovery under the facts of the case. (T1 at 7).

At trial, Ms. Johnson testified that for about the last four or five years prior to the fire the deed to the house was in her

---

**1.** On January 26, 1990, the debtor also filed "Plaintiffs First Amended Adversary Complaint" which included the same request for out of pocket living expenses in the sum of $875.00 per month.

name only, although it originally listed both her name and her husband's name. (T1 at 23). Ms. Johnson testified that she purchased the house in 1980 or 1981. (T1 at 23, 29). She testified that the year before the fire she had occasionally taken in boarders to help her with the mortgage payment. (T1 at 25). But, at the time of the fire there were no boarders. (T1 at 26). Ms. Johnson testified that at the time of the fire the mortgage company, New York Guardian, was paying the cost of the insurance coverage renewal that took place in July of 1988. (T1 at 72).

Ms. Johnson testified that two weeks before the fire, she left her house because the electricity had been disconnected. (T1 at 14, 16). At that time Ms. Johnson testified that she and her three children were staying overnight at 945 Boundary road, Wenonah, New Jersey, with her girlfriend Elaine Bundy, within "five minutes walking" distance of 109 Brookfield Avenue. (T1 at 14–15, 19, 28). She testified that prior to the fire, she had made arrangements to have the electricity reconnected on Friday, November 25, 1988, the day after Thanksgiving Day, the day of the fire. (T1 at 17). She stated at trial that she visited her property about every other day to ensure that everything was in order and to pick up clothes for herself and her children. (T1 at 18, 20). She learned the day of the fire that the water and gas had also been shut off. (T1 at 21–22).

At a deposition, Ms. Johnson stated that on the day of the fire, Thanksgiving Day, November 24, 1988, she had visited her home. (D-1, Examination under Oath dated February 9, 1989 at page 31) (hereinafter "D1 at ____"). Ms. Johnson stated that she shut the front door and that it locked automatically. (D1 at 32). At trial, Mr. John Quinn, a fire investigator with Dove Associates, testified that his investigation of the subject fire on December 1, 1988 established that the fire originated inside the garage and that it was incendiary, that it was set. (T1 at 137). Quinn also testified that the front door lock latch did not go into the keeper, but if it was pulled closed, it would remain shut if a wind did not blow it open. (T1 at 142). He testified that Ms. Johnson told him that she would pull the door shut and leave it in that position. (T1 at 142). He further testified that Ms. Johnson told him that the day before the fire she had visited the house twice, at 5:00 p.m. and 9:30 p.m., that the front door would not lock, but it was still closed and everything was okay. (T1 at 143). Mr. Quinn testified that on December, 1988 he asked Ms. Johnson whether before the fire she had experienced any problem with vandalism or unlawful entry into the subject premises. (T1 at 139). Quinn further testified that Ms. Johnson stated that she had gone on a trip the previous April or May 1988 and that when she returned neighbors had complained to her that children went into the garage and brought out some records and used them as frisbees. (T1 at 140). Quinn testified that there were two doors on the garage, an overhead garage door and a single hung door in the back of the garage which was blocked by storage on the inside of the garage. (T1 at 143). Quinn testified that regarding the overhead garage door, Ms. Johnson stated that she would close the door but normally would not lock it. (T1 at 143).

Quinn testified that during his inspection on December 1, 1988, he saw no physical evidence of forced entry at the front door of the premises. (T1 at 144).

Ms. Johnson at trial testified that in the seven years she had lived in the home, she had never experienced problems with anyone trying to break in. (T1 at 82; *see also* D1 at 32 (Ms. Johnson stated she had not had problems with "too much stealing" so she did not lock the overhead garage door)).

At trial, Ms. Johnson testified that an overhead door into the garage was closed but unlocked before the fire and that at the time she moved out, a couple of weeks before the fire, she did not make any effort to secure that door or add a lock to it. (T1 at 59, 81).

At trial, Ms. Johnson testified that on November 24, 1988, she received a call from her mother that the house was on

fire. (T1 at 22). By the time she arrived, the fire department had almost completely stopped the fire. (T1 at 22). Ms. Johnson testified that she cooperated fully with Allstate's investigation (T1 at 46) and that she was never charged with a crime related to the fire. (T1 at 23). She testified that the claims for losses she filed were true and accurate to her knowledge. (T1 at 33–42).

Mr. Richard Ferguson, an underwriting analyst with Allstate Insurance Company testified that based on evidence in Allstate's computer data base, Allstate was not advised that the mortgage on the subject premises was foreclosed, or that the utilities had been disconnected at some point before the fire, or that Ms. Johnson had moved out of the premises for some period before the fire. (T1 at 102–103).

Mr. Ferguson testified that if Allstate had been notified of the mortgage foreclosure on the subject home, Allstate would have taken measures to cancel the insurance policy. (T1 at 109).

Mr. Daniel Hartwig, a property homeowner adjuster employed by Allstate Insurance Company testified that New York Guardian Mortgage Corporation has not submitted a claim to Allstate. (T1 at 151).

Hartwig also testified that on November 28, 1988 Allstate made an advance payment of $1,000.00 payable to Theresa Johnson and Guardian Adjustment as an advance on contents. (T1 at 152). Hartwig also testified that on January 3, 1989, Allstate made another advance to Ms. Johnson and Guardian Adjustment in the amount of $1,200.00 as an advance on contents. (T1 at 152).

Allstate argues that the insurance policy is void based on three reasons: one, Ms. Johnson's alleged post loss misrepresentations; two, an unreported increase of hazard in the risk assumed by Allstate; and three, a lack of an insurable interest in the home at the time of the loss. (Allstate Insurance Company's Trial Brief dated October 24, 1991 at page 3).

The Court finds that the policy must be upheld. The following discussion addresses each argument and the reasons for upholding the policy.

## DISCUSSION

This Court has considered the issues before it under the guidance of certain fundamentals of interpretation of insurance policies as established in New Jersey law. New Jersey courts have determined that insurance policies should be construed liberally in favor of the insured. *Longobardi v. Chubb Insurance Co. of New Jersey*, 121 N.J. 530, 537, 582 A.2d 1257 (1990) (citing *Kievit v. Loyal Protective Life Insurance Co.*, 34 N.J. 475, 482, 170 A.2d 22 (1961)). Furthermore, New Jersey courts have signaled a preference that the contract should be upheld if a fair interpretation of the law allows it. *Longobardi*, 121 N.J. at 537, 582 A.2d 1257 (citing *Kievit*, 34 N.J. at 482, 170 A.2d 22); *see also Krieg v. Phoenix Insurance Co.*, 116 N.J.L. 467, 473, 185 A. 21 (E & A 1936) (insurance policies liberally construed to uphold contract and forfeiture provisions construed most strongly against insurer). The words of the insurance policy, however, should be given their ordinary meaning and in the absence of ambiguity the court should not apply a strained construction to support the imposition of liability. *Longobardi*, 121 N.J. at 537, 582 A.2d 1257; *Brynildsen v. Ambassador Insurance Co.*, 113 N.J.Super. 514, 518, 274 A.2d 327 (Law Div.1971).

Allstate alleges that the insurance policy must be declared void because Ms. Johnson violated the concealment or fraud provision of the policy. The policy specifically provides that it "is void if you intentionally conceal or misrepresent any material fact or circumstance, before or after loss." (Allstate Policy, D–6 at p. 6).

The Supreme Court of New Jersey, in *Longobardi v. Chubb Insurance Co. of New Jersey* 121 N.J. 530, 539, 582 A.2d 1257 (1990) determined that such a provision covers any misrepresentations made when the insured is applying for coverage as well as when the insurer is investigating the loss. The *Longobardi* court explained, however, that forfeiture of the policy results only if the misrepresentation is knowing and material. *Longobardi*, 121 N.J. at

540, 582 A.2d 1257. "A mere oversight or honest mistake" the court noted "will not cost an insured his or her coverage; the lie must be wilful." [sic] *Id.* (citing *Claflin v. Commonwealth Insurance Co.,* 110 U.S. 81, 95–97, 3 S.Ct. 507, 515–16, 28 L.Ed. 76 (1884)); *Public National Bank of New York v. Patriotic Insurance Co. of America,* 105 N.J.L. 477, 482–83, 144 A. 566 (E. & A. 1929); *Couch on Insurance 2d* section 49A:66 at 580–81, section 49A:67 at 582–83) (Rev. ed. 1982).

Furthermore, the *Longobardi* court held that a misstatement is material if at the time it is stated "a reasonable insurer would have considered the misrepresented fact relevant to its concerns and important in determining its course of action." *Id.* 121 N.J. at 542, 582 A.2d 1257. (citations omitted). Applying this test to the facts before it, the Supreme Court of New Jersey concluded that the insured's (Longobardi) misstatements were material since he, under examination, denied knowing two persons involved in a series of insurance fraud schemes involving facts similar to those in Longobardi's claim. *Id.* at 543, 582 A.2d 1257. The court recognized that the insurance company would have legitimate concerns about Longobardi's relationships with such parties. *Id.*

In the instant case, Allstate stated that Ms. Johnson made certain misrepresentations that amounted to material post loss misrepresentations. First, Allstate claimed that Ms. Johnson included a claim for loss of a vanity sink, but that this item, in fact, did not belong to Ms. Johnson. Second, Allstate claimed that Ms. Johnson testified at the February 9, 1989 examination under oath and at trial that her front door was locked, but that in fact, the front door was not locked.

At trial, Doris Robinson, a friend of Ms. Johnson's, testified that she had at one time stored a vanity sink in Ms. Johnson's garage. (Transcript dated October 24, 1991 at page 3–4) (hereinafter "T2 at ____"). Ms. Robinson equivocally testified that she did not know when she had stored the item in Ms. Johnson's garage nor did she know if it had been removed from the garage. (T2 at 5–6). Ms. Robinson's testimony demonstrated that essentially, she had no interest in the vanity sink, whether or not it remained with Ms. Johnson. Furthermore, Ms. Johnson testified that the sink items for which she made claims did not belong to Ms. Robinson and were not the same items that Ms. Robinson had been storing in Ms. Johnson's garage. (T2 at 9–10).

Allstate requests that this Court consider the issue of the vanity sink as a knowing and material misrepresentation. From the testimony at trial, it is questionable whether Ms. Johnson housed the vanity sink in her garage at the time of the fire. Ms. Johnson did testify, however, that she made no claim for any items belonging to Ms. Robinson. Accordingly, the Court finds that no knowing and material misrepresentation was made by the debtor here.

Allstate alleges that Ms. Johnson misrepresented the fact that her front door was locked at the time of the fire. Allstate pointed to an examination under oath as well as trial testimony, wherein Ms. Johnson stated that she locked the front door the day of the fire. Ms. Johnson, during her February 9, 1989 examination under oath, testified in response to questions from Christopher P. Leise, Esquire, attorney for Allstate:

Q: Did you keep the house locked while nobody was living there?

A: Yes, I did.

Q: Was that true on the day of the fire?

A: The fire marshal said that the door was open on the day of the fire.

Q: What I'm asking you is, the last time you were there, prior to the time of the fire, it was your understanding—

A: It was locked, yes.

Q: Are you sure about that?

MR. DANIELS: She answered the question.

BY ME. LEISE:

Q: The fire occurred on a Thursday evening?

A: Yes.

Q: And, I think you were notified about 8:00?

A: Yes.

Q: By the way, that was Thanksgiving, I guess?

A: Yes, it was Thanksgiving.

Q: When was the last time that you had been, let's say, at the property, generally, 109 Brookfield?

A: I believe it was the day before.

Q: Wednesday?

A: Yes, I wasn't there at all on Thanksgiving Day.

Q: On Wednesday, did you go inside?

A: Yes, yeah.

Q: Did you need a key to get in?

A: Yes, I did.

Q: Did you lock it when you left?

A: Yes, I do. It automatically locks.

Q: Now, there's also a garage area; correct?

A: Yes.

Q: Was the area into the garage locked?

A: No. Was there anything valuable kept in the garage?

A: Quite a bit, yes.

Q: Any reason why you didn't lock it?

A: I just never had any problems with too much stealing or anything, just not habit. Bad habit.

Q: There would have been overhead garage doors?

A: Yes.

Q: Was it one or two?

A: Just one.

Q: Was there also a way to get into the garage, a regular door?

A: There was a back door; but, that remained locked all the time.

Q: So, the door that was open—

A: Would be the big heavy one.

D–1 at pp. 31–33.

At trial on July 18, 1991, Ms. Johnson testified as follows in response to questions by David P. Daniels, Esquire, attorney for the debtor:

Q: Now, did you do any checking on your property to see if it was secure?

A: Yes, I did. I had—everything was still in my property, our clothes, everything. My kids were in school, so I was going back and forth getting clothes and checking on the house and making sure everything was all right almost every day, every other day.

Q: Well, was the property locked?

A: Yes, it was.

Q: Did you check the doors to see that they were locked every time you went back there?

A: When I went, I primarily checked the front door. I didn't go to each door, but I was certain that they were locked.

T1 at 18.

At trial, on July 18, 1991, in response to questions from Mr. Leise, attorney for Allstate, Ms. Johnson testified as follows:

Q: Mrs. Johnson, I'd like to ask you some questions about the number of doors and entrances in to the home on Brookfield Avenue. There were several ways to get in, correct?

A: Yes.

Q: And I'm talking about back in 1988 when all this was taking place with the fire and you moving out, etcetera.

A: Yes.

Q: Before the fire?

A: Before the fire.

Q: There was a front door?

A: Yes.

Q: There was a garage door?

A: Yes.

Q: Garage door was an overhead door?

A: Yes.

Q: Now, isn't it true that the lock on the front door didn't work effectively and you could gain access through that front door?

A: That is not true.

Q: Do you remember speaking to various representatives of Allstate after the fire who were investigating the fire?

A: Yes, I do.

Q: Including Mr. Hartwig?

A: Yes, I do.

T1 at 57–58.

Fire investigator, John Quinn, testified that the locking device on the door was defective. Furthermore, Mr. Quinn testi-

fied that Ms. Johnson told him she would just pull the door shut. Allstate claims that this discrepancy in the testimony is a material misrepresentation.

The testimony indicated some questions about whether the front door was operable. If the front door could not be locked at the time of the fire, then presumably Ms. Johnson misrepresented the fact that she locked the door. This Court examines the situation under the presumption that Ms. Johnson stated the door was locked, since she had pulled it shut, and that in fact, it did not lock. This does not amount to a knowing and material misrepresentation as defined in *Longobardi*. Instead, at worst, it is in the nature of an honest mistake. Allstate learned the day of the fire that the lock was not operating effectively and thus, it was not denied important information in the investigation. More importantly, Ms. Johnson's misrepresentation does not appear to be a knowing attempt to conceal a fraudulent scheme. In fact, at the February 9, 1989 deposition examination Ms. Johnson disclosed information that she had obtained from the fire marshal that the door was open on the day of the fire. (D–1 at 31).

■ Allstate, in its second argument, claims that coverage of Ms. Johnson's policy must be suspended due to an increase of hazard at the time of loss. The increase in hazard allegedly was due to: one, Ms. Johnson's mortgage company had foreclosed on the home, which Allstate argues resulted in a change of ownership; second, the termination of all utility services before the fire; third, Ms. Johnson had vacated the property before the fire; and the garage and main dwelling were unlocked; fourth, the character of the home changed from single family to single family with boarders.

The state of New Jersey requires that a basic fire insurance policy contain certain clauses. *See* N.J.Stat.Ann. § 17:36–5.20 (West 1985) (mandates certain clauses and provides specific language for these required clauses). One such clause is the "increase of hazard" clause, which provides that the company will not be liable for an increase in hazard that is within the control or knowledge of the insured. N.J.Stat. Ann. § 17:36–5.20.

Several courts have considered the meaning of "increase of hazard." In *Goldman v. Piedmont Fire Insurance, Co.*, 198 F.2d 712, 714 (3d Cir.1952), the United States Court of Appeals for the Third Circuit explained that the "hazard" referred to in the clause "is, of course, the hazard of fire, not of some other casualty." *See also Asbell v. Pearl Assurance Co.*, 59 N.J.Super. 324, 329, 157 A.2d 728 (App.Div.1960) (increased hazard exists if continuing threat of loss by fire beyond degree of risk originally contemplated by insurer when issuing the policy).

In *Goldman v. Piedmont Fire Insurance Co.*, 198 F.2d 712, 713 (3d Cir.1952), the insured rented a one-story building in which he stored fans and parts. During a heavy snowstorm, a portion of the roof collapsed and the center skylight fell in, "causing the side walls to bulge and break away from each other at the corners and leave cracks and openings through which a person could enter the building." *Goldman*, 198 F.2d at 713. The *Goldman* court indicated that the insured made no effort to rectify the situation and approximately one month later, a fire destroyed the building. *Id.* at 714. The court concluded that this was sufficient evidence to find an increase in the risk of fire. *Id.* The court also held that where the insured had knowledge of the increased hazard and that the means to abate it are within the insured's control, but the insured does not take steps open to him to abate the hazard, the insurance remains suspended until he does so. *Id.* at 715.

Relying on the reasoning in *Goldman*, the New Jersey Superior Court in *Asbell v. Pearl Assurance Co.*, 59 N.J.Super. 324, 329, 157 A.2d 728 (1960), found that the insured had increased the risk of fire, under a standard hazards clause in the insured policy. The insured had suffered losses from a fire and did not take steps to decrease the risk of another fire, and shortly thereafter, another fire occurred. *Asbell*, 59 N.J.Super. at 329, 157 A.2d 728.

The Superior Court, in *Asbell*, faulted the insured for failing to remove debris from the first fire and board up the windows and doors, which the court identified as an "extra-hazardous situation." *Id.* at 327, 329, 157 A.2d 728.

These two cases exemplify that courts recognize that the increase in hazard means hazard of fire. Most recently, in *Industrial Development Associates v. Commercial Union Surplus Lines Insurance Co.*, 222 N.J.Super. 281, 292–95, 536 A.2d 787 (App.Div.), *cert. den.*, 111 N.J. 632, 546 A.2d 546 (1988), the Superior Court of New Jersey focused on the use of an acetylene torch that came in contact with chemical residue and started a fire. Again, the use or changed condition caused an increase in the risk of fire.

In addition, the *Industrial Development* court also noted that an increase in hazard occurs " 'when a new use is made of the insured property, or when its physical condition is changed from that which existed when the policy was written and the new use or changed condition increases the risk assumed by the insurer.' " *Industrial Development*, 222 N.J.Super. at 291–92, 536 A.2d 787 (quoting *8 Couch, Insurance* (2 ed. 1984) section 37A:291 at 329). The court instructed that the determination of whether there has been an increase of hazard is a question of fact to be decided by a jury "unless the evidence is so conclusive that reasonable minds could not differ." *Industrial Development*, 222 N.J.Super. at 292, 536 A.2d 787 (citing *Orient Insurance Co. v. Cox*, 218 Ark. 804, 238 S.W.2d 757, 762 (1951) and *Couch* section 37A:302 at 346). Finally, the court commented that "the insurer bears the burden of proving that the insured has increased the hazard." *Industrial Development*, 222 N.J.Super. at 292, 536 A.2d 787 (citing *Couch*, section 37A:305 at 352).

The standard fire clause, as mandated by the New Jersey statute, provides that the increase in hazard must be "within the control or knowledge of the insured." N.J.Stat.Ann. § 17:36–5.20; *see also* Allstate Policy, D–6 at page 7 ("Losses We Do Not Cover: *We* do not cover loss to the property described in the *Dwelling protection* coverage resulting in any manner from...." Any substantial change or increase in hazard, if changed or increased by any means within the control or knowledge of an *insured person*). The court in *Industrial Development* emphasized that therefore, a finding of the insured's negligence is not necessary to constitute a violation of the increased hazard clause. *Industrial Development*, 222 N.J.Super. at 294, 536 A.2d 787. Instead, "it is only a change in the condition or use of the premises which will defeat an insured's claim ..." *Id.* The court added that "if the insured is negligent but the essential condition and use of the premises remains the same on the date of a loss as at the inception of the policy, there is no violation of an increase of hazards clause." *Id.* at 294–95, 536 A.2d 787. (citing *Orient Insurance Co. v. Cox*, 238 S.W.2d at 761–62); *see also Krieg v. Phoenix Insurance Co.*, 116 N.J.L. 467, 474, 185 A. 21 (E. & A.1936) (forfeiture of policy due to increase in hazard follows only if situation within control or knowledge of insured or the insured should have known by exercising ordinary care).

In the instant case, Allstate claims that there was an increase in the hazard due to various changed conditions. Allstate listed a number of changes in Ms. Johnson's circumstances, but failed to demonstrate how these amounted to an increase in the risk of fire.

Ms. Johnson's mortgage company, New York Guardian Mortgage Corp., had foreclosed and ostensibly had arranged for the sale of the property. This foreclosure action does not, however, increase the risk of fire. Similarly, Ms. Johnson had on occasion allowed boarders to rent a room in her home. Allstate failed to show that such a use increased the risk of fire. Furthermore, no boarders were staying at the home at the time of the fire.

Allstate noted that all the utility services had been disconnected before the fire. Allstate failed to show how the termination of the utilities increased the risk of fire. In fact, the disconnection of the electricity suggests a decrease in the risk of fire. At

most, without electricity or gas, it is possible that the pipes could freeze and burst. Such a calamity was less unlikely to occur, however, since the water had also been shut off. Finally, Ms. Johnson had made efforts prior to the fire to have the electric reconnected, the only utility she knew of to be disconnected.

Allstate alleged that Ms. Johnson's property had been "completely vacated" before the fire, the main garage door and the door to the house remained unlocked and as such, were indications of the increase in hazard. (Allstate Insurance Company's Trial Brief at p. 8). Ms. Johnson had left her home two weeks prior to the fire because the electricity had been disconnected. She testified that she visited the property on an almost daily basis, to ensure that everything was in order. This cannot be characterized as "completely vacated." Ms. Johnson's leaving the premises appears prudent under the circumstances, since she had three children. Her testimony indicated that she intended to have the electricity reconnected so that she could return to her home.

The fact that certain doors remained unlocked does not automatically increase the risk of fire. The courts in *Asbell* and *Goldman* suggested that collapsed roof, walls, doors and windows amounted to an increase in the risk of fire. Ms. Johnson's "unlocked" doors do not rise to the more drastic circumstances described in those cases.

■ In its third and final argument, Allstate stated that Ms. Johnson's policy must be void because she did not prove that she had an insurable interest in the property at the time of the loss. New Jersey law requires that each fire insurance policy limit the amount of insurance "to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss, without allowance for any increased cost of repair or reconstruction by reason of any ordinance or law regulating construction or repair and without compensa-

tion for loss resulting from interruption of business or manufacture, nor in any event for more than the interest of the insured ...." N.J.Stat.Ann. § 17:36–5.19.

The New Jersey Supreme Court, in *P.R. DeBellis v. Lumbermen's Mutual Casualty Co.*, 77 N.J. 428, 435, 390 A.2d 1171 (1978) noted the majority view that the "insured's interest is to be fixed at the time of the casualty." (citing *Wolf v. Home Insurance Co.*, 100 N.J.Super. 27, 241 A.2d 28 (Law Div.), *aff'd o.b.* 103 N.J.Super. 357, 247 A.2d 345 (App.Div.1968)); *see also Miller v. New Jersey Insurance Underwriting Association*, 82 N.J. 594, 600, 414 A.2d 1322 (1980) (insurable interest in property must exist at time of loss). The *DeBellis* court determined that "the coverage would depend upon the reasonable expectation of the insured." *DeBellis*, 77 N.J. at 436, 390 A.2d 1171. The court added, however, that "the amount of recovery may not necessarily be limited to the precise situation of the insured as of the date of the casualty and subsequent events may be significant in determining the insured's interest." *Id.*

In *Miller v. New Jersey Insurance Underwriting Association*, 82 N.J. 594, 601, 414 A.2d 1322 (1980), *on remand*, 177 N.J.Super. 584, 427 A.2d 135 (1981), *aff'd*, 188 N.J.Super. 175, 457 A.2d 23, *cert. den.*, 94 N.J. 508, 468 A.2d 169 (1983), the New Jersey Supreme Court reiterated the rule it formulated in *DeBellis* that the insurable interest is determined in terms of reasonable expectations of the insured. The court noted that an insurable interest need not rise to the level of legal or equitable title and that "an insured retains an insurable interest as long as he has a reasonable expectation of deriving pecuniary benefit from the preservation of the property or would suffer a direct pecuniary loss from its destruction." *Miller*, 82 N.J. at 600, 414 A.2d 1322. Furthermore, the court added, that "[w]ith respect to real estate, an insurable interest need not rise to the level of legal or equitable title." *Id.*

Relying on *DeBellis*, the *Miller* court concluded that the insured plaintiffs had an insurable interest in their property, despite an *in rem* foreclosure judgment before the

loss by fire. *Miller*, 82 N.J. at 602, 414 A.2d 1322. The court noted that after foreclosure proceedings, the plaintiffs "continued to occupy their respective premises" and thus, "could reasonably believe that their fire insurance policies protected them from losses they might suffer upon destruction of their premises." *Id.* The court emphasized that "continuing possession left plaintiffs with insurable interests of value ..." and they did not lose all reasonable expectations concerning the property "merely because they lost title to them." *Id.* Finally, the court stated that "[t]o deny recovery 'would create a windfall for the insurance company and ignore what we conceive to be the reasonable expectations of the parties.'" *Id.* (quoting *DeBellis*, 77 N.J. at 437–38, 390 A.2d 1171).

The reasoning in *Miller* and *DeBellis* is equally applicable in the instant case to show that Ms. Johnson had an insurable interest. Ms. Johnson may have had a foreclosure judgment against her, but she continued to remain in possession of the property. She testified that she believed the insurance policy remained in effect, despite her delinquency in the mortgage payments, as a result of payments made by New York Guardian Mortgage Corp., thus exhibiting a reasonable expectation of coverage from losses due to fire. (T1 at 71–73).

In *Miller*, the court found that the plaintiffs were "entitled to present proof of the value of their interests at a plenary hearing" and that at trial the plaintiffs have the burden of proving the value of those interests. *Miller*, 82 N.J. at 603, 414 A.2d 1322. Furthermore, the court held that the plaintiffs would be allowed to recover "[t]o the extent that [they could] establish their interests have a pecuniary value." *Id.* at 604, 414 A.2d 1322. The court noted, however, that it could not make this determination on the limited record before it, but concluded that plaintiffs must be given an opportunity to show the value of their interests. *Id.*

On remand, the trial court found that the first insured plaintiff Miller's interest in the subject property at the time of the fire was $4,500.00. *Miller v. New Jersey Insurance Underwriting Association*, 188 N.J.Super. 175, 180, 457 A.2d 23 (App.Div. 1983). The trial court's calculation, which was affirmed by the Appellate Division, was made as follows:

Although he [the trial judge] found Miller's asserted monthly rental roll of $835, which he computed out to $10,000 a year, was exaggerated, Judge Yanoff used that figure for purposes of assessing Miller's interest. He rejected Miller's $7,000 estimate of repair expenses as unsupported. Accepting Miller's allegation of a $10,000 yearly rental income, from that figure the judge subtracted taxes of $2,000, $1,000 for heating, $350 for insurance and $1,000 in mortgage payments. He concluded from this that Miller could have paid the mortgage and the municipal taxes if he had in fact realized a yearly rent roll of $10,000. Assuming a yearly payment of $1,000 on the tax arrearages, Miller could have realized a net income of $4,250 (by our calculation, $4,650). He concluded that Miller's gross income from the building was between $4,000 and $5,000.

Judge Yanoff indicated that he took these post-fire events into account in computing plaintiff's interest: (1) tax payments were never made; (2) no attempt to protect the property was made and (3) the unpaid taxes and interest accumulated to the point where, at trial, they totalled approximately $30,000. Taking all of these facts into account, as well as the fact that Miller had occupied the property since June 1973, and for the next two years had paid no taxes, Judge Yanoff found Miller's interest in the property was $4,500.

Underlying Judge Yanoff's assessment of Miller's interest as $4,500 was the assumption that he had, at best, one more year of "milking" the property before Newark would either demand rental payments or commence summary dispossess action. In light of the testimony of the tax representative of the city that the tenant Horovera did not begin to pay the city rents until 1976, and that a dispossession action was commenced against

McNair in August 1976, such assumption is supportable. The city representative testified he had attempted to begin the landlord-tenant relationship between the city and residents of 226 Springfield in October 1975. The dispossess action did not commence until August of the following year because of the backlog of matters in Newark's legal department. In addition, if the representative is believed, Miller's lack of expectation as to continued use of the property is inferable from his removal of improvements from the premises shortly after learning that the city was closing in. He testified that he stopped doing business on the property after the fire.

188 N.J.Super at 185–186, 457 A.2d 23.

On remand, the trial court found that the insured plaintiff Norwood's interest in the subject property could be valued at the time of the fire at $13,332.00. *Id.* at 188, 457 A.2d 23. The trial court arrived at that figure by concluding from the evidence that the cost to restore the building to its condition prior to the fire would have been $20,000.00, to which amount the court applied a coinsurance clause as meaning that two-thirds of the above amount was covered by the policy, i.e., $13,332.00. *Id.*

The Appellate Division affirmed this award of valuation. In so ruling, the Appellate Division stated:

Judge Yanoff apparently took the cost approach to measure the Norwoods' interest in the property instead of the alternative financial approach taken in *Miller.* Considering the differences between the way Miller and the Norwoods regarded their respective properties, we find the different approach to be appropriate. In Judge Yanoff's view, Elijah Norwood regarded himself as the legal owner of the property who, although not entirely successful in keeping current with all of his expenses relating to the property, nevertheless did what was necessary to keep title in himself (with the miscalculation as to the City of Newark). We find Judge Yanoff's finding that the Norwoods had a reasonable expectation of nearly unlimited ownership and occu-

pancy of the premises to be supported by the evidence.

As to Judge Yanoff's failure to take into account the thousands of dollars owed in back taxes and the amount of Gilbert's outstanding mortgage, defendant does not provide any support for the argument that these financial aspects are to be computed in determining an insured's interest in property damaged by fire, nor have we found support for that position. To the contrary, it has been held that an insured may recover the entire loss under the policy irrespective of encumbrances. 6 *Appleman, Insurance Law and Practice,* § 3868 at 347 (1972).

188 N.J.Super at 190–92, 457 A.2d 23.

Allstate argues that while the parties have stipulated that the reasonable cost of repairing the damage caused by the fire at or about a reasonable time after the fire was $68,721.48, (T1 at 7), Ms. Johnson did not prove the pecuniary value of her interest in the dwelling and therefore, coverage must be denied.

This Court having found that the homeowner's policy must be upheld, therefore needs to determine the amount the debtor is entitled to recover under the policy. The Allstate policy states that coverage for loss to building structures will be settled by either the Replacement Cost method or the Actual Cash Value method. (D–6). The subject policy provides under Section "5. How We Settle a Loss":

**Building Structures**

Covered loss to building structures insured under the **Dwelling Protection** coverage will be settled by one of the following methods:

a) Replacement Cost. This means there will not be a deduction for depreciation.

Payment will not exceed the smallest of the following amounts:

1) the replacement cost of the part of the building damaged for equivalent construction and use on the same premises;

2) the amount actually and necessarily spent to repair or replace the damaged building; or

3) the limit of liability applicable to the building.

**We** will not pay more than the actual cash value of the damaged property until the repair or replacement is completed.

b) Actual Cash Value. This means there may be a deduction for depreciation.

If **you** decide not to repair or replace the damaged property, settlement will be on an actual cash value basis, not to exceed the limit of liability applicable to the building. **You** may make claim within 180 days after the date of loss for any additional payment on a replacement cost basis if **you** repair or replace the damaged property.

D–6 at p. 18. *See also, Wolf v. Home Insurance Co.,* 100 N.J.Super. 27, 41, 241 A.2d 28 (1968) (insurance company only liable for actual cash value if reconstruction or repair is impossible). At trial, the parties stipulated that the reasonable cost of repairing the damage to the dwelling caused by the fire amounted to $68,721.48. (T1 at 7).

New Jersey law requires an insurer to pay the face value of the insurance policy *to the extent* of the actual cash value, but not exceeding the cost to repair or replace the property "nor in any event for more than the interest of the insured." N.J.Stat.Ann. § 17:36–5.19.

Under this provision read together with the insurance policy, Allstate must cover the replacement costs so long as this amount does not exceed the interest of the insured. Accordingly, this court must determine if there is sufficient evidence of the value of Ms. Johnson's interest, and if so, if the replacement costs exceed the value of this interest.

New Jersey law provides only minimal guidance on the issue of measuring the value of an insurable interest. In *DeBellis,* the New Jersey Supreme Court held that the extent of coverage would be measured by "the reasonable expectations of the insured." *DeBellis,* 77 N.J. at 436, 390

A.2d 1171. The court allowed the insured, a holder of a Certificate of Seized Property delivered by the Internal Revenue Service to recover the value of his possessory interest on the date of the loss. The court noted that it was "fair to presume that the value was equivalent to at least the amount expended for that interest some three months before the fire." *Id.* at 438, 390 A.2d 1171. Accordingly, the Court held that judgment should be entered in favor of the plaintiff in that amount, plus interest to the date of the fire, and that the plaintiff was entitled to a partial return of premium, its interest in the property having been severed on July 19, 1974, the date the prior owner redeemed the property. *Id.* The Supreme Court concluded that determination of that amount would be made by the trial court, both parties being able to introduce relevant evidence on that issue, and remanded the proceedings to the trial court for further proceedings. *Id.* at 437–38, 390 A.2d 1171.

In *Miller,* the New Jersey Supreme Court concluded that the insured's continued possession of property, despite in rem tax foreclosure proceedings, the entry of a judgment of foreclosure and the loss of title, amounted to an insurable interest of value. *Miller,* 82 N.J. at 602, 414 A.2d 1322. The *Miller* court noted that the insured persons "could reasonably believe that their fire insurance policies protected them from losses they might suffer upon destruction of their premises." *Id.*

Finally, the New Jersey statute defines an insurable interest as including "any lawful and substantial economic interest in the safety or preservation of property from loss, destruction or pecuniary damage." N.J.Stat.Ann. § 17:37A–8(a)(3). In addition, courts in other jurisdictions have found pecuniary value in the insurable interests in property, even though the insured may not have legal title, and these courts have awarded recovery amounts based on the loss suffered due to damage to the property. For example, in *Aetna Insurance Co. v. King,* 265 So.2d 716, 717 (Fla.Dist.Ct.App.1972) the court awarded the amount for losses due to the destruc-

tion by fire of a grocery store building and its contents. The insured had conveyed the property to her daughters, but continued to receive financial support from the proceeds of the store building (*i.e.*, rent proceeds went to the insured). The Florida court, based on the same statutory language defining insurable interest as N.J.Stat.Ann. § 17:37A–8(a)(3),[2] noted that the "measure of the insurable interest is the extent to which the insured will be damnified by the loss of the property." *King*, 265 So.2d at 718.

In this case, Ms. Johnson resided in her home for nearly 8 years, prior to the fire. Although she had fallen delinquent in her mortgage payments to the point that the mortgage company obtained a foreclosure judgment, she remained in possession of the property at the time of the fire.[3] This Court finds that Ms. Johnson had a reasonable expectation that any loss or damage from fire would be recovered under her insurance policy. While the parties stipulated that the reasonable cost of repairing the damage to the dwelling caused by the fire at or about a reasonable time after the fire was $68,721.48, the record is devoid of sufficient testimony or evidence regarding the pecuniary value of the debtor's interest in the dwelling. This Court finds that there is sufficient evidence, however, of Ms. Johnson's interest in the contents and the pecuniary value of that interest. Ms. Johnson owned all of the items she listed as losses of personal property in her claims for loss of contents in the amount of $31,219.95. As for the real estate and dwelling, to the extent that the debtor can establish that her interest in the Brookfield Avenue property has a pecuniary value, she will be allowed to recover under the policy. *Miller*, 82 N.J. at 604, 414 A.2d 1322. On this record, however, the Court cannot determine the pecuniary value of the debtor's insurable interest in the Brookfield Avenue property. The debtor will be given an opportunity to establish the value of that interest at a further hearing.

The debtor has also requested additional living expenses in the amount of $875.00 per month, since November 24, 1988. The Allstate Policy provides additional living expenses to an insured in certain situations. (Allstate Policy, D–6 at page 14). The policy states "*We* will pay the reasonable increase in living expenses necessary to maintain *your* normal standard of living when a loss *we* cover makes *your residence premises* uninhabitable." (Allstate Policy, D–6 at page 14). Under

---

2. N.J.Stat.Ann. § 17:37A–8(a)(3) provides:

a. Any person having an insurable interest in insurable property, who has failed to procure essential property insurance from an authorized insurer in the normal insurance market, shall, on or after the effective date of the plan of operation, be entitled to apply to the association for such coverage and for an inspection of the property. Such application may be made on behalf of an applicant by a broker or agent authorized by him. Every such application shall be submitted on forms prescribed by the commissioner after consultation with the directors of the association and shall contain information sufficient to indicate:

(3) Whether or not there is any unpaid, uncontested premium due from the applicant for prior insurance on the property (as shown by the insured having failed to make written objection to charges, within 30 days after billing). The term "insurable interest," as used in this section, shall be deemed to include any lawful and substantial economic interest in the safety or preservation of property from loss, destruction or pecuniary damage.

3. Ms. Johnson no longer resides at the 109 Brookfield Avenue dwelling and will not return to it, since, according to her testimony at trial, the Township of Deptford demolished the house. (T1 at 52–53). This court granted an order allowing the Township of Deptford to demolish the real property at 109 Brookfield Avenue and provided that such action did not violate the automatic stay in bankruptcy (Order dated August 21, 1990). The fact that Ms. Johnson's real property was demolished nearly two years after the fire does not preclude recovery or necessarily decrease the amount of recovery as determined by this Court. The court in *DeBellis* noted the majority viewpoint that the insured's interest is to be fixed at the time of the casualty. *DeBellis*, 77 N.J. at 435, 390 A.2d 1171. In addition, the court explained that the "key criterion" for determining coverage is the reasonable expectation of the insured. *Id.* at 436, 390 A.2d 1171. Finally, the court commented that "the amount of recovery may not necessarily be limited to the precise situation of the insured" at the time of loss but "subsequent events may be significant in determining the insured's interest."

this provision, the insured can receive payment for a maximum of nine consecutive months from the time of loss. *Id.*

Mr. Mark Milstein, the president of Guardian Adjustment Service testified that no written claim was submitted to Allstate Insurance company on behalf of Theresa Johnson for additional living expenses. Accordingly, Ms. Johnson did not submit a claim for additional living expenses or a signed proof of loss relating to those expenses even though Allstate sent Ms. Johnson a January 3, 1989 letter indicating the proper compliance procedures for coverage, including additional living expenses. (*see* Exhibit D–11). The subject Deluxe Homeowners Policy provides under Section "3. What You Must Do After A Loss":

3. What You Must Do After a Loss

In the event of a loss to any property that may be covered by this policy, *you* must:

(a) promptly give *us* or *our* agent written notice. Report any theft to the policy as soon as possible. If the loss involves a credit card, charge plate or bank fund transfer card, written notice must also be given to the company or bank that issued the card or plate.

(b) protect the property from further loss. Make any reasonable repairs necessary to protect it. Keep an accurate record of any repair expenses.

(c) promptly separate damaged from undamaged personal property. Give *us* a detailed list of the damaged, destroyed or stolen property, showing the quantity, cost, actual cash value and the amount of loss claimed.

(d) give *us* all accounting records, bills, invoices and other vouchers, or certified copies, which *we* may reasonably request to examine and permit *us* to make copies.

(e) produce receipts for any increased costs to maintain *your* standard of living while *you* reside elsewhere, and records supporting any claim for loss of rental income.

(f) as often as *we* reasonably require:

(1) show *us* the damaged property.

(2) submit to examinations under oath and sign a transcript of the same.

(g) at *our* request, give *us* a signed, sworn proof of loss within 60 days from the date of loss. This statement must include the following information:

(1) the date, time, location and cause of loss;

(2) the interest *you* and others have in the property, including any encumbrances;

(3) the actual cash value and amount of loss for each item damaged, stolen or destroyed;

(4) any other insurance that may cover the loss;

(5) any changes in title, use, occupancy or possession of the property that have occurred during the policy period;

(6) at *our* request, the specifications of any damaged building or other structure;

(7) evidence supporting a claim under the Credit Card, Bank Transfer Card, Check Forgery and Counterfeit Money protection. State the cause and amount of loss.

(D–6 at p. 17–18).

The January 3, 1989 letter informed Ms. Johnson that Allstate required her to provide a notarized proof of loss. Ms. Johnson submitted two Proofs of Loss subsequent to this letter, of which Allstate has acknowledged receipt. (*See* Proofs of Loss dated January 23, 1989 and February 7, 1989). Ms. Johnson's only request for additional living expenses came in the form of an amended complaint to this Court more than one year after the fire and the January 3, 1989 letter. (*See* Plaintiff's First Amended Adversary Complaint dated January 25, 1990 and Plaintiff's First Amended Complaint dated April 11, 1990).

In *Brindley v. Fireman's Insurance Co. of Newark*, 35 N.J.Super. 1, 10, 113 A.2d 53 (App.Div.1955), the court stated that if a proof of loss is a required condition in an insurance contract, "non-compliance is fatal to recovery in the absence of a showing of waiver or at least of substantial compliance." (citations omitted). Here, this

Court finds that Ms. Johnson did not comply with the proper procedures to obtain the additional coverage, Allstate did not waive the requirements, and therefore, no additional living expenses will be awarded.

This Court finds that coverage in favor of the debtor under the homeowner's policy must be upheld and that Ms. Johnson is entitled to the amount of $31,219.95, as requested in the February 7, 1989 proof of loss she filed with Allstate for loss of personal property contents, less the $2,200.00 Allstate paid Ms. Johnson as an advance on contents subsequent to the fire. A separate plenary hearing shall be conducted by the Court on *May 26, 1992 at 2:00 p.m.*, at which time the parties shall submit additional proofs on the pecuniary value of the debtor's insurable interest in the Brookfield Avenue property.

Each party shall bear its own costs.

An order in conformance with this Opinion shall be submitted.